AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA Litton

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No. 2:23-mj-543 |
| A Cell Phone Extraction Report from an Apple iPhone ) | |
| XR with Assigned IMEI #353061106207629, Currently ) | |
| Located at the Grove City Police Department ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2114(a) | -Assault/robbery of any person who has lawful charge or control of the mail. |
| 18 U.S.C. § 924(c) | -Use/carrying of a firearm during and in relation to a crime of violence. |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tyler Schwab, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 3, 2023
_____

City and state: Columbus, Ohio
_____

Kimberly A. Jolson
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELL PHONE EXTRACTION REPORT FROM AN APPLE IPHONE XR WITH ASSIGNED IMEI #353061106207629, CURRENTLY LOCATED AT THE GROVE CITY POLICE DEPARTMENT, 3360 PARK STREET, GROVE CITY, OHIO | CASE NO. ___2:23-mj-543___<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Tyler Schwab, being first duly sworn, hereby depose and state as follows:

## I.  INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant under Rule 41 of the Federal Rules of Criminal Procedure authorizing the examination of property—a cell phone extraction report—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 6, 2019.  I have been assigned to the FBI Safe Streets Task Force in Columbus, Ohio, since January of 2023.  Prior to being assigned to the Safe Streets Task Force, I was assigned to the Joint Terrorism Task Force (JTTF) for approximately four years.  During my assignment at the JTTF, I was a Case Agent and Co-Case Agent for multiple international and domestic terrorism investigations.  While assigned to the JTTF, I received specialized training in international terrorism and homicide investigations.  Furthermore, I have received training in computer-related crimes as well as in the criminal use of email, social media, and telephonic communications.  As a Special Agent with the FBI, I am empowered to enforce the criminal laws of the United States.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## II.  BACKROUND ON RECENT POSTAL ROBBERIES AND MAIL THEFT

4.     Federal law prohibits people from assaulting United States Postal Service (USPS) letter carriers with the intent to rob them of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier. 18 U.S.C. § 2114(a). The same statute prohibits people from robbing or attempting to rob those letter carriers of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier. *Id.*

5.     When someone commits such an assault or robbery and puts in jeopardy the life of the individual having custody of such mail, money, or other property of the United States by the use of a dangerous weapon, that person commits an "aggravated" assault or robbery under 18 U.S.C. § 2114(a), which qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A). *Knight v. United States*, 936 F.3d 495, 501 (6th Cir. 2019). As such, when someone uses or carries a firearm during and in relation to an aggravated assault or robbery under § 2114(a), they have also violated 18 U.S.C. § 924(c)(1)(A). *Knight*, 936 F.3d at 497, 501.

6.      Federal law also prohibits people from stealing any key to any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter. 18 U.S.C. § 1704.

7.      Finally, federal law prohibits people from stealing or attempting to steal any mail matter from or out of any mail receptacle or from any letter carrier. 18 U.S.C. § 1708. The same statute prohibits people from buying, receiving, concealing, or unlawfully possessing any mail matter that has been so stolen if the person has knowledge that the item was so stolen. *Id.*

8.      The United States, including the United States Postal Inspection Service (USPIS) and the FBI, has been conducting a criminal investigation into violations of 18 U.S.C. §§ 2114(a), 924(c), 1704, and 1708 committed in and around Central Ohio. The current investigation involves a pattern of violent, armed robberies wherein the suspect(s) hold USPS letter carriers at gunpoint and then force them to hand over their USPS "arrow keys" or "modified arrow keys." USPS letter carriers carry arrow keys and modified arrow keys when they deliver the mail. These keys allow letter carriers to gain entry to secured mail receptacles ("blue boxes") and secured cluster mailboxes found at apartment and condominium complexes. As of the writing of this affidavit, approximately thirty robberies have occurred from January 5, 2022, to September 25, 2023, throughout the Columbus, Ohio area that have been identified as part of this pattern.

9.      Once the suspect(s) obtain the stolen keys, those suspect(s) then use those keys to open secure mail receptacles and cluster boxes to steal mail matter. This process of stealing the mail is sometimes referred to as "fishing." The stolen mail matter includes, among other valuable items, personal checks, business checks, and other negotiable financial instruments. The suspect(s) then wash these checks and/or reproduce them through fraudulent means before subsequently cashing and/or depositing them at ATMs and other locations. This process of washing and/or reproducing the checks is sometimes referred to as "cooking."

10. Because a stolen USPS key can be utilized to "fish," "cook," and subsequently profit from, the stolen keys retain intrinsic value in and of themselves. I have learned that suspect(s) who rob letter carriers of their keys will sometimes sell those keys to third parties or "rent" them out to third parties for a discrete period without ever fishing or cooking themselves.

11. I know, based on my knowledge, training, and experience, that individuals who are involved in the criminal activity described above often use cell phones to coordinate the initial assaults and/or robberies of the letter carriers and to facilitate the fishing, cooking, and financial crimes previously described.

12. More specifically, I know that individuals involved in the criminal activity described above use cell phones to coordinate meetups with co-conspirators and others involved in the planning and execution of the initial postal assaults and/or postal robberies—including to procure firearms for use during those assaults and/or robberies. Those individuals also use cell phones for navigation purposes both to and from the site of an assault and/or robbery. Likewise, those individuals use cell phones to take photographs and videos of themselves in possession of stolen USPS keys and/or stolen mail matter. Those same individuals also use cell phones to coordinate the sale and/or rental of USPS keys to third parties. Finally, those individuals use cell phones to coordinate the fishing, cooking, and negotiation of stolen or fraudulent financial instruments. This use of cell phones involves calls, texts, social media applications, navigation tools, and a host of other available applications.

13. I also know from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

### III. IDENTIFICATION OF THE PROPERTY TO BE EXAMINED

14.     The property to be searched is a Cellebrite Extraction Report, developed by Grove City Police Detective Matthew Mullins, depicting the contents of an Apple iPhone XR with assigned IMEI #353061106207629 (the "**EXTRACTION REPORT**"). The **EXTRACTION REPORT** is located at the Grove City Police Department, 3360 Park Street, Grove City, Ohio.

### IV. PROBABLE CAUSE

15.     I submit there is probable cause to believe that violations of 18 U.S.C. § 2114(a) [Aggravated Assault/Robbery of Postal Employees] and 18 U.S.C. § 924(c) [use or carrying of a firearm during and in relation to a crime of violence] (collectively, the "**TARGET OFFENSES**") have been committed by Kenan M. Lay (LAY), also known as "SWERV," and other individuals both known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

#### A.  Attempted Armed Robbery – October 20, 2022

16.     On October 20, 2022, at approximately 5:17 p.m., Inspectors with the USPIS responded to 1612 Lockbourne Road, Columbus, Ohio, in reference to an attempted armed robbery of a postal worker.

17.     Upon arrival, Investigators spoke with a postal worker victim, "J.P.," a person over eighteen years old, who advised the following:

18.     While J.P. was outside of the German Village Postal Worker Annex, two suspects approached him. One of the suspects motioned that he had a firearm and demanded that J.P. hand over his postal keys. J.P. refused to give the suspects his postal keys and shoved one of the suspects. Both suspects then fled the scene on foot. The suspects were unsuccessful at getting J.P.'s postal keys during this robbery.

5

19.     On August 18, 2023, and September 8, 2023, Postal Inspectors and other law-enforcement agents, including your affiant, met with a cooperating informant who was involved in, participated in, helped plan, and had knowledge of multiple armed postal robberies and attempted postal robberies committed in the Columbus, Ohio area and elsewhere.  That informant ("CI #1") admitted to his own role in roughly a dozen postal robberies – either as a planner, facilitator, or participant – and shared information regarding the spate of other recent postal robberies, mail theft, and related financial crimes described throughout this affidavit.  CI #1 is currently facing federal charges for his role in several of these robberies.  CI #1 met with investigators in the hope of receiving more favorable consideration in his current case, but no promises were made to him regarding the nature or extent of any charging and/or sentencing leniency.  To date, the information that CI #1 provided has proved truthful and reliable through corroboration from other human sources, law-enforcement reports, cell-site location data and GPS location data, and other electronic evidence obtained during this investigation.

20.     CI #1, who was involved in, participated in, helped plan, and had knowledge of four postal robberies and/or attempted robberies that LAY was involved in, provided the following information regarding Attempted Armed Robbery #1:

21.     LAY was involved in this attempted robbery with two other individuals—one driver and one other individual who approached the postal worker on foot with LAY.  Following the attempted robbery, they told CI #1 that they tried to rob the postal worker, but the postal worker would not give up his keys.  They ended up in a scuffle with the postal worker.  CI #1 knew that this robbery was supposed to take place somewhere off Parsons Avenue, but the postal worker did not show up at the time they thought they would.  As a result, LAY and the two other individuals ended up following a different postal worker back to a Post Office where they attempted to rob

him. According to CI #1, LAY was carrying a firearm during this attempted robbery, but CI #1 did not think that LAY pulled the gun out. LAY and the two other individuals were unsuccessful in obtaining the postal keys during this attempted robbery.

### B. Armed Robbery – January 17, 2023

22. On January 17, 2023, at roughly 3:10 p.m., Inspectors with the USPIS responded to 400 South 5th Avenue, Columbus, Ohio, in reference to a robbery of a postal worker.

23. Upon arrival, Investigators spoke with a postal worker victim "D.S.," a person over eighteen years old, who advised the following:

24. While delivering mail on a central collections mail route in the area of 400 South 5th Avenue, a suspect approached D.S. on foot and attempted to grab his postal keys from him. The suspect was brandishing a handgun. The suspect then took D.S.'s postal keys and fled the area in a vehicle. The postal keys that were stolen included a modified arrow key. D.S. described the driver of the vehicle as a black male, wearing a gray hoodie and black face mask.

25. According to CI #1, CI #1, LAY, and two other individuals were involved in this robbery. Prior to the robbery, CI #1 drove LAY and one other individual to the Brookville neighborhood to pick up a stolen vehicle they were going to use for the robbery. The stolen vehicle they used during this robbery was a silver KIA sedan. The stolen Kia would not initially start, so they had to call yet another individual who came and jump-started the car. Once the stolen Kia was started, LAY and the other individual drove it, while CI #1 followed them in his vehicle to a McDonald's. When they got to the McDonald's, a fourth individual met up with them and provided the location of where the postal worker would be located. CI #1 then left this meeting and spotted a postal worker. CI #1 then called the fourth individual, who called LAY and told him where the postal worker was located.

26.     When LAY and one of the other individuals got to where the postal worker was located, LAY parked the stolen KIA sedan and the other individual got out of the vehicle. The other individual approached the postal worker and tried to pull the postal worker's key, which was still in the mailbox, out of the mailbox. When the key did not come out of the mailbox, the other individual lifted his shirt and showed the postal worker his gun. The other individual then shut the mailbox and pulled the postal key out of the mailbox. While the robbery was taking place, CI #1 was in the area watching it happen.

27.     Following the robbery, LAY and the other individual ditched the stolen KIA sedan in the area of 24th Street and Joyce Avenue, where CI #1 picked them up. CI #1 then took the other individual home in the Reynoldsburg area. CI #1 and LAY then went to a Walmart located on South High Street where they met the fourth individual. CI #1 and the fourth individual ended up paying LAY for the postal keys. CI #1 then drove LAY back to his residence, which was located in the Driving Park area.

28.     Additionally, during a review of the contents of CI #1's phone, investigators found a text conversation between CI #1 and LAY. During this conversation, LAY was using phone number (614) 596-2479 and identified himself as "SWERV" on October 5, 2022. Later, in this same text chain, on January 17, 2023, LAY and CI #1 exchanged the following messages:

Lay:    are we on!

CI #1:  Yop

CI #1:  Send lo

Lay:    when we ready

Lay:    so I can suit up

Lay:    1692 E Kossuth St

CI #1:  Im fin leave at 11

Lay:    you getting me?

CI #1:  Ye

29.     Further on in that same text conversation from January 17, 2023:

CI #1:  Yu gotta blicc?

Lay:    fasho

30.     Through my knowledge, training, and experience in this investigation and others, I know that when CI #1 wrote, "Yu gotta blicc?" he was asking LAY if LAY had a firearm. The term blicc is slang for gun. Also, when CI #1 wrote "Send lo," he was requesting that LAY send him his location, which LAY did by providing his address as 1692 East Kossuth Street, which is in the Driving Park neighborhood. Additionally, when LAY wrote, "so I can suit up," LAY was referring to getting the things together he will need for the robbery, such as his gray hoodie and black face mask.

31.     Additionally, at the time of this robbery, CI #1 was under court-ordered electronic monitoring while out on bond in an unrelated criminal case. As a result, CI #1 was wearing an ankle monitor that recorded his locations. CI #1's ankle monitor corroborates what he told investigators as his ankle monitor recorded CI # 1's locations on January 17, 2023, at the following times:

- CI #1 was at 1692 East Kossuth Avenue (LAY'S residence), at approximately 12:07 p.m. (picking up Lay prior to the robbery).

- CI #1 was in the Brookville neighborhood from approximately 1:26 p.m. to 2:11 p.m. (CI #1 dropping off LAY and the other individual at the stolen Kia sedan prior to the robbery and trying to get the vehicle jump started).

- CI # 1 was at the McDonald's located at 381 East Main Street from approximately 3:04 p.m. to 3:08 p.m. (meeting location with the fourth individual).

- CI #1 was in the area of 400 South 5th Avenue (robbery location site) at approximately 3:11 p.m. (contemporaneous with the robbery).

- CI #1 was at the Walmart located at 3579 South High Street from approximately 5:54 p.m. to 6:33 p.m. (meeting location where CI #1 and the fourth individual paid LAY for the postal keys).

- CI #1 was at 1692 East Kossuth Avenue (LAY'S residence) at approximately 6:57 p.m. (dropping Lay off after the robbery).

### C. Armed Robbery – April 24, 2023

32.     On April 24, 2023, at roughly 11:30 a.m., Inspectors with the USPIS responded to Parkway Village Drive, Grove City, Ohio, in reference to a robbery of a postal worker.

33.     Upon arrival, Inspectors spoke with postal worker victim "K.H.," a person over eighteen years old, who advised the following:

34.     While delivering mail at the community mailboxes within the Parkway Village Apartment complex, K.H. was approached from behind.  A gun was brandished and K.H. was directed to give the suspect the keys.  K.H. complied and the suspect got away with his postal keys, gas card, and a backpack of personal belongings.

35.     CI #1 was also involved in orchestrating this robbery.  According to CI #1, prior to the robbery taking place, CI #1 drove CI #2, Thierno Bah, and LAY to a Menards' parking lot where they met up with other people.  Once at the Menards' parking lot, LAY got out of CI #1's vehicle and got into another vehicle with Thierno Bah and one other individual.  Thierno Bah has

since been arrested and indicted for his role in multiple postal robberies. LAY, Thierno Bah, and the other individual then left the Menards' parking lot to do the robbery.

36.     After the robbery took place, everyone met at a McDonald's, but they moved down the street to a neighborhood to complete the transaction. CI #1 and another individual split the payment for this key. CI #1 gave LAY/Thierno Bah $500 and the other person gave LAY/Thierno Bah $1,000 for the postal key.

37.     CI #1 knew that Thierno Bah used LAY'S gun to commit the robbery. LAY had a Taurus handgun, which CI #1 saw LAY with prior to the robbery taking place. CI #1 knew that Thierno Bah used this gun during the robbery because after the robbery took place, Theirno Bah told CI #1 that LAY let him use it.

38.     CI #2, who has knowledge of and was present for the meetings prior to and following a number of postal robberies, told investigators that prior to this robbery taking place, CI #2, CI #1, and Theirno Bah met other individuals at a McDonalds on Lockbourne Road. Once at McDonald's, Thierno Bah and SWERV left with other individuals to do the robbery. After the robbery was completed, they all met back up at the McDonald's again but went down the street to a neighborhood to complete the transaction. CI #2 saw LAY and Thierno Bah get approximately $1,500 in cash for the postal key.

39.     CI #1 was again wearing his ankle monitor during this robbery. The GPS data from the ankle monitor shows that CI #1 was at the following locations on April 24, 2023:

- CI #1 was in the Menards' parking lot located at 831 Hilliard Rome Road from approximately 10:03 a.m. to 10:12 a.m.
- CI #1 was at McDonald's located at 4601 West Broad Street from approximately 10:28 a.m. to 10:38 a.m.

11

- CI #1 was at McDonald's located at 2441 Lockbourne Road from approximately 12:07 p.m. to 12:29 p.m.

- CI #1 was then in a neighborhood located on Edsel Avenue which is Southeast of the McDonald's located at 2441 Lockbourne Road from 12:34 p.m. to 12:46 p.m.

40.     Based on my knowledge, training, and experience, criminal informants do not always get the locations correct when they are recounting events months after they occurred. So, when CI #2 told investigators that prior to and after the robbery they met at a McDonald's on Lockbourne Road, CI #2 was not one hundred percent correct. They did meet at a McDonald's prior to the robbery, but this McDonald's was located at 4601 West Broad Street. However, after the robbery, they did meet at a McDonald's located at 2441 Lockbourne Road. Due to the amount of time that passed from when the robbery took place until the time CI #2 told investigators about the robbery, approximately two months, it is understandable that CI #2 did not get the location of the first McDonald's correct.

### D. Armed Robbery – May 11, 2023

41.     On May 11, 2023, at roughly 9:26 a.m., Inspectors with the USPIS responded to the Post Office located at 2873 West Broad Street in reference to a robbery of a postal worker.

42.     Upon arrival, Inspectors spoke with postal worker victim "B.F.," a person over eighteen years old, who advised the following:

43.     While outside the Post Office, a suspect approached B.F. and told her to give him the keys. When B.F. asked the suspect what keys he was referring to, the suspect hit B.F. on the side of her head with a gun. The suspect then demanded the keys again. B.F. was then followed by the suspect into the Post Office. Once inside the Post Office, B.F. got the arrow keys from the retail window and threw them at the suspect. The suspect then departed the Post Office on foot.

12

During this robbery, the suspect was able to obtain arrow key #98-27596 and the new modified arrow key #D899-20024.

44. The firearm was described as a black semi-automatic handgun. The slide was lighter than the frame and the barrel was lighter than the slide.

45. According to CI #1, on the morning of the robbery, prior to the robbery taking place, CI #1 drove CI #2, Thierno Bah, and one other individual to LAY'S house. When they got to LAY'S house, LAY gave them his gun. The gun LAY gave to CI #1 was a Taurus and was the same gun that LAY had previously used in one of the other postal robberies.

46. CI #1's ankle monitor also shows that he was in the area of 1692 East Kossuth Street, LAY'S residence, on the morning of May 11, 2023, at approximately 6:39 a.m.

47. Text conversations between CI #1 and LAY from CI #1's phone were also found from May 11, 2023. At approximately 1:33 a.m. on May 11, 2023, CI #1 and LAY had the following discussion:

CI #1: Tryn let me use yo blicc tmr

CI #1: I'll throw $100 Juss need for hr

LAY: bet

LAY: Only for hr?

48. Based on my knowledge, training, and experience, I know that "bet" is slang for ok or alright. So, when CI #1 asked LAY if he could use his gun tomorrow, LAY responded with "bet," or ok.

49. Further on in the same conversation, at approximately 6:02 a.m., the following text exchange occurred:

LAY: when you coming

13

CI #1:  Fin leave rn be dere in 30

LAY:  1692 e kossuth

50.     CI #1's CashApp records from May 11, 2023, also show that CI #1 paid $100 to Kenan Lay at approximately 6:39 a.m., corroborating CI #1's payment to LAY for use of his firearm during this robbery.

### E.  Arrest of Kenan Lay – August 26, 2023

51.     On August 26, 2023, Grove City Police Officers pulled over a vehicle for failing to stop at a stop light.  LAY was a rear-seat passenger in this vehicle.  The driver indicated he did not have a driver's license.  When asked about the smell of marijuana coming from the vehicle, the driver stated that he put a roach out in a bottle of the vehicle.  The driver later stated that there was also some raw marijuana in the vehicle, but he would not state where in the vehicle.  Grove City Police Officers searched the vehicle and located a baggie of marijuana on the side of the front passenger's seat and two baggies under the center console.  While searching the rear seat of the vehicle, where LAY had been seated, officers found a backpack.  Inside the backpack, officers found a loaded Taurus GC2 handgun (S/N: TMC11502), nineteen bags of marijuana, two scales with marijuana residue, a box of plastic baggies, and a wallet with LAY'S information inside.  When officers asked about the bookbag, LAY stated that it was his and that the handgun inside belonged to him.  Officers also found two phones in LAY's possession: (1) an Apple iPhone 11 with IMEI #356561109941329 and (2) an Apple iPhone XR with IMEI #353061106207629.

52.     LAY was arrested and initially charged with Improper Handling of a Firearm and Trafficking in Drugs in Franklin County Municipal Court Case No. 2023-CRA-013944. On September 11, 2023, prosecutors dismissed those charges for future indictment.

53.     As part of Grove City's narcotics investigation, Judge James E. Green of the Franklin County Municipal Court authorized a search warrant to examine the contents of both of LAY's iPhones.  On August 28, 2023, the Grove City Police Department conducted a forensic extraction of the contents of both of those cell phones, which led to the creation of a Cellebrite Extraction Report for each device, which depict the contents of the devices. The Grove City Police Department later returned both devices to LAY.  The extraction reports currently remain in the custody of the Grove City Police Department.  Therefore, while the FBI might already have all necessary authority to examine the **EXTRACTION REPORT**, I seek this additional warrant out of an abundance of caution to be certain that such an examination will comply with the Fourth Amendment and other applicable laws.

## V.  TECHNICAL TERMS

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

16

    f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

55.    Based on my training, experience, and research, I know that iPhones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VI. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

56.    Based on my knowledge, training, and experience, I know that iPhones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on an iPhone. This information can sometimes be recovered with forensics tools.

57.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the iPhone from which the **EXTRACTION REPORT** was taken was used, the purpose of its use, who used

it, and when. There is probable cause to believe that this forensic electronic evidence might be the

**EXTRACTION REPORT** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

58.     *Nature of examination.*     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the "copying of electronically stored information" from the **EXTRACTION REPORT** that already exists, consistent with the warrant.

59.     *Manner of execution.*     Because this warrant seeks only permission to copy the **EXTRACTION REPORT** and examine its contents for evidence of additional criminal activity, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VII.  CONCLUSION

60.     I submit that this affidavit supports probable cause for a search warrant authorizing the copying and examination of the **EXTRACTION REPORT** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Tyler Schwab
Special Agent
FBI

Subscribed and sworn to before me on_____October 3_____, 2023

Kimberly A. Jolson
United States Magistrate Judge

19

## ATTACHMENT A

### Property to Be Searched

The **EXTRACTION REPORT** is further described as a forensic download – in the form of a Cellebrite Extraction Report – of the contents of an Apple iPhone XR, with assigned IMEI #353061106207629, that was taken from the device by Grove City Police Detective Matthew Mullins on or about August 28, 2023, pursuant to a search warrant issued by Franklin County Municipal Court Judge James E. Green. The **EXTRACTION REPORT** is currently located at the Grove City Police Department, 3360 Park Street, Grove City, Ohio. This warrant authorizes the copying and examination of the **EXTRACTION REPORT** for the purpose of identifying the information described in Attachment B.

**ATTACHMENT B**

**Items to Be Seized**

All records in the **EXTRACTION REPORT** described in Attachment A that relate to violations of 18 U.S.C. §§ 2114(a) and 924(c)(1)(A) and involve KENAN M. LAY from October 20, 2022, until August 26, 2023, including:

1. Any information related to the planning or execution of attempted postal robberies or postal robberies (including names, addresses, phone numbers, or any other identifying information of other involved parties);

2. Any information related to the purchase, acquisition, sale, or disposition of a firearm or ammunition (including names, addresses, phone numbers, or any other identifying information of other involved parties);

3. All bank records, checks, credit card bills, account information, and other financial records;

4. Incoming and outgoing call data;

5. Dates and times of telephone calls;

6. Text message log and text message content stored on the device, under whatever messaging application(s) were installed;

7. Stored images and/or videos;

8. Emails;

9. Location data;

10. Records of Internet Protocol addresses used;

11. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

12. Social media feeds, history, and messaging; and

13. Evidence of user attribution showing who used or owned the device that led to the **EXTRACTION REPORT** described in Attachment A at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

21

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.